USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/16/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                         :
THE CARLTON GROUP, LTD.,                   :
                               Plaintiff,       :
                                                         :              16 Civ. 6649 (LGS)
             -against-                             :
                                                         :              **OPINION AND ORDER**
MIRABELLA SG SpA,                              :
                                            Defendant.  :
                                                         :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

        Plaintiff The Carlton Group, Ltd. ("Carlton") brings this action against Defendant Mirabella SG SpA ("Mirabella"), alleging that Mirabella breached the terms of an Exclusive Debt and Equity Advisory Agreement ("Agreement") and subsequent amendment ("Amendment"). Defendant moves to dismiss Plaintiff's Amended Complaint ("Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6) and seeks costs and fees related to the motion. For the following reasons, Defendant's motion and fee request are denied.

## I. BACKGROUND

        The following facts are taken from the Complaint and accompanying exhibits. *See* Fed. R. Civ. P. 10(c); *Tannerite Sports, LLC v. NBCUniversal News Grp.*, No. 15-3485-cv, --- F.3d ----, 2017 WL 3137462, at *8 (2d Cir. July 25, 2017). All facts are construed, and all reasonable inferences are drawn, in favor of Carlton as the non-moving party. *See Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

### A. Mirabella Contracts with Carlton to Refinance and/or Restructure its Debt

        Plaintiff Carlton is a debt and equity capital markets adviser for commercial real estate in the United States and Europe. Defendant Mirabella is an Italian corporation that owns several properties in Naples, Italy, including a large complex that is currently leased to the United States

as a naval base (the "Navy Complex"). On July 10, 2014, Carlton entered into an Agreement with Mirabella to refinance up to €605 million of Mirabella's existing debt, obtain for Mirabella a €30 million working capital loan and/or negotiate a discounted payoff of the existing debt. It was critical that Mirabella's existing debt be addressed because, at the time the parties signed the Agreement, the debt was in default and Mirabella was at risk of losing its properties, including the Navy Complex.

B.     **Terms of the Agreement**

Section 1(A) of the Agreement gives Carlton the exclusive right to negotiate on Mirabella's behalf to obtain a "Commitment" to refinance Mirabella's existing debt during the term of the Agreement. The Agreement defines a Commitment as "one or more mortgage loan, mezzanine loan, preferred equity and/or joint venture equity term sheets, letters of intent, applications, indications of interest or other financing arrangements . . . issued by one or more mortgage lender(s) (each a 'Lender'), mezzanine or subordinate lender(s), equity investor(s) and/or joint venture investment partner(s) (each of the foregoing, an EJV Party") . . . ."

Section 1(B) gives Carlton the exclusive right to negotiate a "DPO" in connection with any or all of Mirabella's existing debt during the Agreement's term. The Agreement defines a DPO as "a discounted payoff, note (loan) purchase (of any one or more notes (loans) which comprise the [e]xisting [d]ebt; or a modification, restructuring, refinancing of the [e]xisting [d]ebt through any structure) . . . ." negotiated with "all or a portion of the existing holders" or servicers of Mirabella's existing debt. The Agreement defines these existing holders and servicers as "Existing Lenders."

The Agreement contemplates four ways that Carlton could earn money under the Agreement. First, Section 3(A) requires that Mirabella pay Carlton a retainer fee of €15,000 per

month during the term of the Agreement, which would be reduced to €10,000 per month if Mirabella accepted, in writing, the terms of a DPO.

Second, sections 3(B) and 3(C) require Mirabella to pay Carlton a commission if, at any time during the term of the Agreement, Mirabella accepted "a Commitment in writing from a Lender and/or an EJV Party" for (1) "first mortgage financing secured by any one or more" of Mirabella's properties and/or (2) "mezzanine or subordinate financing . . . or any similar financing or equity investment arrangement" on Mirabella's properties. Pursuant to section 3(E), Mirabella would also owe a commission if it accepted a Commitment in the year following the Agreement from an entity that received a financing and investment memorandum from either Carlton or Mirabella and communicated an interest in pursuing a financing arrangement with Mirabella. Sections 3(A) and 3(D) provide that any retainer fees actually paid to Carlton would be credited (offset) against any commission.

Third, in the event that Carlton negotiated a DPO with one or more of Mirabella's Existing Lenders, section 3(F) requires Mirabella to pay Carlton a "DPO Advisory Fee" of 5% of the "gross difference between the current outstanding principal balance of the [e]xisting [d]ebt and the amount of the gross savings based on the amount of the DPO . . . ." The DPO Advisory Fee would be due upon the closing of a DPO during the term of the Agreement or in the twelve months following its expiration.

Fourth, if a DPO did not occur but one or more of Mirabella's Existing Lenders agreed to a "Restructuring" instead, section 3(F) requires Mirabella to pay Carlton a "Restructuring Fee" in the same amount as the DPO Advisory Fee. The Agreement defines a Restructuring as "a restructuring and/or work-out of all or any portion of the [e]xisting [d]ebt with" Existing Lenders.

The Agreement states that if either party sues to enforce the terms of the Agreement, the "prevailing party" is entitled to recover costs and fees incurred in the litigation. The Agreement further states that it shall be interpreted in accordance with New York law.

**C.    Terms of the Amendment**

On January 12, 2015, Mirabella and Carlton signed the Amendment, section 5 of which provides:

> Notwithstanding anything contained in the [Agreement] or this Amendment to the contrary, [Mirabella] agrees that if Carlton procures and delivers to [Mirabella] a bona fide Commitment of not less than €300M from Gatehouse Bank . . . (a "Gatehouse Commitment"), then in connection with any Restructuring as contemplated by [s]ection 3(F) of the [Agreement] (which for purposes of clarity shall specifically include any refinancing, "rollover"/extensions and/or other workout or loan modification) by any one or more of the Existing Lenders . . . , [Mirabella] shall pay Carlton a Restructuring Fee in an amount not less than €2,500,000 . . . . The Restructuring Fee shall still be due and payable to Carlton even if [Mirabella] at any time during the [t]erm of this Agreement . . . submits a [restructuring plan] with the Existing Lenders . . . . For sake of clarity, if Carlton does not procure and/or deliver to [Mirabella] a Gatehouse Commitment, then the above clarifications regarding a Restructuring . . . shall remain, provide[d] that, the Restructuring Fee shall be in such amount(s) as determined based on [s]ection 3(F) of the [Agreement].

The Amendment also extended the term of the Agreement to December 31, 2015, and deleted references to the €30 million working capital loan. All other terms and conditions of the Agreement remained unchanged.

**D.    Carlton Procures a Term Sheet from Gatehouse Bank**

During the term of the Agreement, Carlton spent "enormous time and effort" attracting prospective lenders. In January 2015, Carlton procured an unsigned term sheet from Gatehouse Bank (the "Gatehouse Term Sheet"), which is attached to the Complaint and which proposed providing "a financing relating to" the Navy Complex. Under the terms of the Gatehouse Term Sheet, a "cell company," "LuxCo2," presumably a Gatehouse affiliate, would be incorporated and would purchase all of the shares of an unnamed "PropCo," presumably a Mirabella affiliate,

4

for the lower of €350 million or 87.5% of the market value of the Navy Complex. Another company, "LuxCo1," presumably another Mirabella company, would receive the purchase amount from LuxCo2 "with no assets or liabilities other than in respect of the chain of ownership of the [Navy Complex]." Following the purchase, LuxCo1 would lease all of the "assets of the PropCo constituting its 'whole business'" back from LuxCo2 in return for lease payments of 5.3% per annum. The Gatehouse Term Sheet lists Gruppo Mirabella SG as a "Sponsor" of the proposed Gatehouse transaction.

The proposed transaction is further described by Mirabella's then counsel, DLA Piper, in a memorandum dated March 30, 2015, and appended to the Complaint. It describes the proposal as a "[r]efinancing [t]ransaction" in the form of a "sale and lease back," whereby Mirabella transfers the Navy Complex to a newly formed company owned by the financing company, Gatehouse or its affiliate, and uses the proceeds of the sale to repay existing debt. The new company would lease the Navy Complex back to Mirabella (according to the Gatehouse Term Sheet, at a rate of 5.3% per annum). If Mirabella failed to pay, the new company would keep the Navy Complex. If Mirabella fully performed, it would have the right at the end of the lease to repurchase the Navy Complex. The memo states, "a sale and lease back is deemed to be a financing transaction, whereby the lessor provides finance in exchange for the purchase of a good, against repayment of the financed amount through lease fees and final re-purchase consideration . . . ."

### E. Events Giving Rise to the Lawsuit

In or about July 2015, Mirabella agreed with its Existing Lenders either to (1) refinance and extend the term of the debt without a discount of the principal balance for a material new term, or (2) restructure the existing debt by reducing the principal balance without materially

5

extending the term -- Plaintiff is unsure which.  Mirabella allegedly cut Carlton out of its negotiations with its Existing Lenders in order to thwart its Agreement with Carlton.

Carlton sent Mirabella an invoice for a €2.5 million Restructuring Fee on account of procuring the Gatehouse Term Sheet, and filed this lawsuit to collect on the invoice.  Carlton later invoiced Mirabella €9,207,343 based on Mirabella refinancing its existing debt.  Mirabella has refused to pay any Restructuring Fee or commission to Carlton.  Mirabella has also failed to pay Carlton a retainer fee for August, September, October, November and December 2015, after which the Agreement terminated.

## II. STANDARD

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party, *id.* at 566, but gives "no effect to legal conclusions couched as factual allegations." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).  To withstand dismissal, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).  In determining the sufficiency of a complaint, a court may consider documents attached to it or incorporated in it by reference.  *See Tannerite Sports, LLC*, 2017 WL 3137462, at *8.

"At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous," *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016), and inconsistent with the plaintiff's claim. A contract is ambiguous under New York law if "its terms could suggest more than one meaning

when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* at 156–57 (citation omitted). A contract is unambiguous if "the contract language has a definite and precise meaning . . . and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 157 (citation omitted). Courts analyze the ambiguity of a contract provision under the "normal rules of contract interpretation: words and phrases should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* (citation omitted).

## III. DISCUSSION

The Complaint alleges that Carlton is entitled to either (1) a €9,207,343 commission with retainer fees offset against the commission, or (2) a €2.5 million Restructuring Fee, plus €75,000 in retainer fees. The Complaint claims these amounts in the alternative -- (1) the commission if the Existing Lenders refinanced the existing debt by materially extending its term, or (2) the Restructuring Fee if they discounted the balance without extending the term. Due to the secrecy inherent in Mirabella's alleged attempt to cut Carlton out of Mirabella's deal with Existing Lenders, Carlton is unsure whether the agreement between Mirabella and its Existing Lenders provides for (1) a refinancing Commitment, subject to a commission; or (2) a Restructuring, subject to a fee of 5% on the gross difference between the original debt and the restructured debt. Drawing all inferences in favor of Carlton, the Complaint pleads facts sufficient to sustain a claim for breach of contract arising from Mirabella's non-payment of amounts due under the Agreement.

Mirabella argues that Carlton cannot be entitled to a commission because the Agreement

unambiguously requires that any Restructuring or refinancing by Mirabella with Existing Lenders could lead only to a Restructuring Fee.  The Agreement does not unambiguously support Mirabella's position because neither the Court nor the Plaintiff knows the precise terms of the deal that Mirabella struck with its lenders, and certain transactions with Existing Lenders arguably could require the payment of a commission.  For example, drawing all inferences in Carlton's favor, the allegations in the Complaint can be read to include a transaction whereby Mirabella accepted a Commitment from its Existing Lenders for new financing to refinance the existing debt.  Section 1(A) of the Agreement could be interpreted to require Mirabella to pay Carlton a commission in this circumstance.  At a minimum, the Agreement is ambiguous as to whether accepting such a Commitment would result in a commission or a Restructuring Fee.  Rather than speculate about all possible scenarios and consider their outcomes under the Agreement, at the motion to dismiss stage, it is sufficient that the Complaint's allegations arguably can sustain a claim for non-payment of a commission.

Mirabella further argues that Carlton is not entitled to a Restructuring Fee because it did not procure a bona fide Commitment from Gatehouse Bank.  This argument goes to the amount of damages, if any, and not the sufficiency of the Complaint.  The Agreement and Amendment permit Carlton to recover a Restructuring Fee regardless of whether it procured a Commitment from Gatehouse.  The Amendment provides that if Carlton procures a bona fide Commitment from Gatehouse and then Mirabella engages in a Restructuring with its Existing Lenders, the Restructuring Fee is "not less than €2,500,000."  The Amendment also expressly provides for Carlton to earn a Restructuring Fee if Carlton does not "procure and/or deliver . . . a Gatehouse Commitment."  In that situation, the amount of Carlton's Restructuring Fee is determined by section 3(F) of the Agreement.  As the Agreement and Amendment do not unambiguously

8

support Mirabella's position, Mirabella's motion to dismiss is likewise denied as to the Restructuring Fee.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the Complaint is DENIED, and its request for fees and costs is accordingly DENIED. Defendant's motion for oral argument is DENIED as moot. The Clerk of Court is respectfully directed to close the motions at Docket Numbers 39 and 48.

Dated: August 16, 2017
      New York, NY

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**