USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/19/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
THE CARLTON GROUP, LTD.,
                Plaintiff,

       -against-                         16 Civ. 6649 (LGS)

MIRABELLA SG SpA,                **OPINION AND ORDER**
                Defendant.
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

      Plaintiff, The Carlton Group, Ltd. ("Carlton") brings this action against Defendant Mirabella SG SpA ("Mirabella"). Carlton alleges that Mirabella breached the parties' Debt & Equity Advisory Agreement (the "Agreement") by failing to pay Carlton compensation that is due. Defendant moves for summary judgment on the issues of Carlton's entitlement to a Commission and Restructuring Fee, and asserts that the amount due to Carlton is zero. Plaintiff opposes Defendant's motion for summary judgment and cross-moves for summary judgment on its breach of contract claim and Defendant's affirmative defenses. For the following reasons, Defendant's motion is granted, and Plaintiffs' motion is denied.

I. **BACKGROUND**

    A. **Factual Background**

      The following facts are taken from the parties' Joint Statement of Undisputed Material Facts and respective Rule 56.1 statements, as amended, as well as materials filed in support of the motions.

        1. **Terms of the Agreement**

      Plaintiff Carlton is a debt and equity capital markets adviser for commercial real estate in the United States and Europe. Defendant Mirabella is an Italian corporation that at all relevant

times owned real property serving as the residential headquarters for U.S. Navy personnel in Naples, Italy (the "Property").  On July 10, 2014, the parties entered into the Agreement.

Section 1(A) of the Agreement appoints Carlton as Mirabella's exclusive broker for obtaining a "Commitment" to refinance Mirabella's existing debt or raise new working capital. The Agreement defines Commitment as "one or more mortgage loan, mezzanine loan, preferred equity and/or joint venture equity term sheets, letters of intent, applications, indications of interest or other financing arrangements . . . issued by one or more mortgage lender(s) (each a 'Lender'), mezzanine or subordinate lender(s), equity investor(s) and/or joint venture investment partner(s) (each of the foregoing, an 'EJV Party') . . . ."

Section 1(B) of the Agreement appoints Carlton as Mirabella's exclusive broker to negotiate with its Existing Lenders (defined as holders of Mirabella's existing debt) a discounted payoff "whether structured as a discounted payoff, note (loan) purchase (of . . . notes . . . which comprise the Existing Debt; or a modification, restructuring, refinancing of the Existing Debt through any structure) (as applicable, a 'DPO')."

Under the Agreement, Carlton could be paid in five ways.  <u>First</u>, Section 3(A) of the Agreement provides for a monthly payment during the term of the agreement of a non-refundable "Retainer Fee" of €15,000 per month, to be reduced to €10,000 per month after any DPO is negotiated, and to be offset against any "Commission" payable to Carlton.  <u>Second</u>, Section 3(B) of the Agreement provides for a "Mortgage Commission" if Mirabella "accepts a Commitment in writing from a Lender and/or an EJV Party for first mortgage financing secured by any one or more of the Properties."  <u>Third</u>, Section 3(C) of the Agreement provides for an "Equity Commission" if Mirabella "accepts a Commitment in writing from a Lender . . . for mezzanine or subordinate financing, joint venture equity and/or preferred equity or any similar

financing or equity investment arrangement with respect to any or more of the Properties."
Fourth, Section 3(F) provides for a "DPO Advisory Fee" if Carlton "negotiates a DPO with any one or more of the Existing Lenders."  Fifth, Section 3(F) also provides for a "Restructuring Fee" if "a DPO of all or any portion of the Existing Debt does not occur, but instead, a restructuring and/or a work-out of all or any portion of the Existing Debt with the Existing Lender(s) occurs."

The amount of the Mortgage Commission is 1% of the Commitment up to 60% of "the total project capitalization for any one or more individual Property or Properties."  The amount of the Equity Commission is 2% of the Commitment for funds in excess of 60% of "the total project capitalization for any one or more individual Property or Properties."  The amount of the DPO Advisory Fee is 5% of the difference between the current principal balance of the Existing Debt and "the amount of gross savings" resulting from the DPO.  The Restructuring Fee is payable "in the amount of the DPO Advisory Fee."

The term of the Agreement was from July 10, 2014, to 12 months from the date Mirabella approved "the financing and investment memorandum."  Mirabella approved the Carlton financing memorandum after the date of the Agreement but before December 4, 2014.

The Agreement states that if either party sues to enforce the terms of the Agreement, the "prevailing party" is entitled to recover costs and fees incurred in the litigation.  The Agreement further provides that it is governed by New York law.

### 2. The Gatehouse Term Sheet

On August 7, 2014, in an email, Gatehouse Bank ("Gatehouse") represented to Mirabella, prior to contacting Carlton, that it "would be interested in financing [the Properties]" and that Gatehouse "would do the financing and . . . then issue a bond."  Gatehouse represented that "[p]art of the financing of the loan will remain with [Gatehouse] and another part . . . [will be

sold] to investors interested [in] buying securitized obligations." In response, Mirabella directed Gatehouse to speak to Carlton, as Mirabella's exclusive agent. In accordance with the Agreement, in the Fall of 2014, Carlton contacted a number of other banks and financial institutions seeking refinancing for Mirabella's properties, including the Property.

Subsequently, on January 7, 2015, Gatehouse emailed Carlton an unsigned and undated term sheet for €350,000,000 along with a diagram of the proposed financing structure related to the Properties (the "Gatehouse Term Sheet"). The Gatehouse Term Sheet stated that Gatehouse sought to finance the Properties through a sale-leaseback, requiring Mirabella to sell the Property and lease it from the lenders.

### 3. The Mirabella-Aareal Agreement

In the meantime, in the Fall of 2014, Mirabella was involved in an Italian Bankruptcy Act Article 182-bis proceeding, which provides a procedure for an insolvent company voluntarily to restructure its debt with its creditors. On December 12, 2014, Mirabella and Aareal Bank ("Aareal"), one of Mirabella's Existing Lenders, entered into a "Debt Restructuring Agreement Pursuant to Art. 182 BIS of the Bankruptcy Law" (the "Mirabella-Aareal Agreement"), which was filed with the Italian Court on December 16, 2014.

Before the Mirabella-Aareal Agreement, Mirabella owed Aareal a total principal amount of €194,500,000 and US$139,994,640, with maturity dates ranging from December 2, 2014, to August 28, 2015 (the "Aareal Existing Debt"). The Mirabella-Aareal Agreement extended the maturity dates for the Aareal Existing Debt to December 2019, without reducing the principal amounts. Section 2.2 of the Mirabella-Aareal Agreement also states:

> Without any novation effect, by express intent of the Parties, the agreements in the Existing Loan agreements . . . are understood to be supplemented and/or modified by the terms and conditions of this Agreement, which shall prevail over any provisions with conflicting content in the Existing Loan agreements, which

4

shall continue to be effective and [] applicable in regard to matters not explicitly regulated by this Agreement."

In the Mirabella-Aareal Agreement, Aareal also agreed "to sign a New Loan Agreement" with Mirabella to provide Mirabella with as much as €10,000,000 pursuant to a credit facility to be secured by a first mortgage on the Property. Pursuant to a new loan agreement executed in October 2015, Aareal loaned Mirabella €6,878,947.08 (the "Aareal New Loan") secured by a subordinate mortgage on the Property.

### 4. The Amendment to the Agreement

On October 29, 2014, in an email, Carlton emailed Mirabella "a summary of the indicative terms from Gatehouse Bank." At this time, Carlton communicated with Mirabella about the sale/lease back structure of the Gatehouse Term Sheet, but did not discuss any tax implications. On December 4, 2014, Carlton sent Mirabella a proposed amendment to the Agreement, with a minimum Restructuring Fee of €3,000,000, if Carlton were to procure and deliver a commitment from Gatehouse. On December 14, 2014, Carlton sent Mirabella a revised proposed amendment that reduced the minimum Restructuring Fee to €2,500,000. On December 29, 2014, a Carlton representative emailed a Mirabella representative, stating that "as soon as you [Mirabella] send us [Carlton] back the signed amendment to [the Agreement] . . . , we [Carlton] will immediately send you [Mirabella] an email from Gatehouse outlining the terms of their finance offer." At Mirabella's request, the words "bona fide" were added to the proposed amendment on January 5, 2015. On January 7, 2015, Carlton received the Gatehouse Term Sheet, but decided internally that it would not tell Mirabella that it had the Gatehouse Term Sheet until it received the signed amendment to the Agreement.

On January 12, 2015, the parties entered into the amendment in the form that Carlton had provided to Mirabella on January 5, 2015 (the "Amendment"). On January 13, 2015, Carlton

5

emailed Mirabella a copy of the Gatehouse Term Sheet. The Amendment includes the following:

> Notwithstanding anything contained in the Original Agreement or this Amendment to the contrary, [Mirabella] agrees that if Carlton procures and delivers to [Mirabella] a bona fide Commitment of not less than €300M from Gatehouse Bank (or any affiliate thereof) (a "Gatehouse Commitment"), then in connection with any Restructuring as contemplated by Section 3(F) of the Original Agreement . . . , [Mirabella] shall pay Carlton a Restructuring Fee in the amount not less than €2,500,000 (Euro). The Restructuring Fee shall still be due and payable to Carlton even if [Mirabella] at any time during the Term of this Agreement commences any bankruptcy proceedings and/or submits a 'Restructuring Plan' with the Existing Lenders or any applicable Court of Law.

The Amendment also clarifies that "restructuring" under Section 3(F) of the Agreement "shall specifically include any refinancing, 'rollover'/extensions and/or other workout or loan modification." The Amendment extended the term of the Agreement to December 31, 2015.

### 5. Events Giving Rise to the Lawsuit

In July 2015, the Italian Bankruptcy Tribunal approved the Mirabella-Aareal Agreement. On December 30, 2015, Carlton sent Mirabella an invoice for a €2,500,000 minimum Restructuring Fee, on account of procuring the Gatehouse Term Sheet, which Mirabella has not paid. On March 9, 2017, Carlton sent Mirabella an invoice for a €9,207,343 Commission, based on the Mirabella-Aareal Agreement, which Mirabella has not paid. Per the Agreement, Mirabella has paid a pro-rated monthly "Retainer Fee" for July 2014 through July 2015, totaling €190,161, but did not make any monthly Retainer Fee payments for August through December 2015, totaling €75,000.

### 6. Procedural History

On August 23, 2016 Carlton filed this lawsuit to collect payment from Mirabella. On March 10, 2017, Carlton filed an Amended Complaint ("Complaint"), asserting one cause of action for breach of contract and seeking payment of either a (1) Restructuring Fee and Retainer

6

Fee, or (2) Commission. On September 1, 2017, Mirabella filed an Answer, which includes nine affirmative defenses, including one for breach of fiduciary duty and another based on the faithless servant doctrine.[1]

On March 31, 2017, Mirabella filed a motion to dismiss the Complaint. On August 16, 2017, Mirabella's motion was denied. *Carlton Group, Ltd. V. Mirabella SG SpA*, 16 Civ. 6649, 2017 WL 3530370 (S.D.N.Y. Aug. 16, 2017).

## II. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is appropriate where the record before the court establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor of the nonmoving party. *See id.* at 255. When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (alteration in original) (internal quotation marks omitted).

---

[1] The remaining affirmative defenses are: failure to state a cause of action (First); waiver, ratification, estoppel (Second); Defendant's satisfaction and discharge of its obligations (Third); Plaintiff's failure to satisfy and discharge its obligations (Fourth); mutual and/or unilateral mistake (Sixth); unclean hands (Seventh); and the Amendment being void (Eighth).

7

"Where a plaintiff uses a summary judgment motion . . . to challenge the legal sufficiency of an affirmative defense -- on which the defendant bears the burden of proof at trial -- a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case." *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)); *accord Washington v. Kellwood Co.*, No. 05 Civ. 10034, 2015 WL 6437456, at *9 (S.D.N.Y. Oct. 14, 2015). "After all, in cases where there is an absence of evidence to support an essential element of a defense, with respect to that defense, there can be no genuine issue as to any material fact since a complete failure of proof concerning an essential element of the defendant's affirmative defense necessarily renders all other facts immaterial." *F.D.I.C.*, 34 F.3d at 54-55 (internal quotation marks omitted). There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim" or defense. *Celotex Corp.*, 447 U.S. at 323 (emphasis in original).

Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed. Fed. R. Civ. P. 56(c); *see Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014). However, a partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims. *Id.* at 195.

**B.     Contract Interpretation**

The threshold question on a contract claim is "whether the contract is unambiguous with respect to the question disputed by the parties." *Peterson v. Islamic Republic of Iran,* 876 F.3d 63, 83 (2d Cir. 2017) (applying New York law). "Where a contract is unambiguous, courts must

8

effectuate its plain language" without resort to extrinsic evidence. *Id.* at 80 (citing *Slamow v. Del. Col.* 594 N.E.2d 918, 919 (N.Y. 1992)) (alteration omitted). If the contract is unambiguous, "[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *Amrusi v. Nwaukoni*, 65 N.Y.S.3d 62, 65 (2d Dep't 2017) (quoting *W.W.W. Assoc. v. Giancotieri*, 566 N.E.2d 639, 642 (N.Y. 1990)). Whether a contract is unambiguous is a question of law to be determined by the court. *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A.*, 773 F.3d 110, 118 (2d Cir. 2014). In contrast, an ambiguous contract raises a question of fact as to the parties' mutual intent, to be resolved by the trier of fact. *See Arnell Constr. Corp. v. N.Y.C. Sch. Constr. Auth.*, 41 N.Y.S.3d 101, 103 (2d Dep't 2016) ("When a term or clause is ambiguous, the parties may submit extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of fact.") (internal citations and quotation marks omitted); *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.").

"To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole." *Amrusi*, 65 N.Y.S.3d at 65. There is no ambiguity if the contract as a whole removes any ambiguity in a particular provision. *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (applying New York law). Conversely, the contract as a whole may create an ambiguity that is not apparent from a single provision in isolation. *See id.* A contract is ambiguous where the terms of the contract "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement . .

. ." *Id.* at 466. A contract that is susceptible to two conflicting, but reasonable, interpretations is ambiguous. *Arnell Constr.*, 41 N.Y.S.3d at 103.

## III. DISCUSSION

Mirabella moves for summary judgment on the issues of Carlton's entitlement to a Commission and Restructuring Fee, and asserts that the amount due to Carlton is zero. Carlton cross-moves for summary judgment arguing that it is entitled to a Commission (and not a Restructuring Fee) on the whole of the Mirabella-Aareal Agreement, i.e., both the rollover of Existing Debt and the loan of additional funds. In its moving papers, Carlton expressly and repeatedly disclaims any entitlement to a Restructuring Fee. Carlton repeatedly asserts that no restructuring occurred and disputes Mirabella's arguments to the contrary. Carlton explains that it sought a Restructuring Fee in the alternative in the Complaint only because it had not yet learned in discovery the terms of the Mirabella-Aareal Agreement. Carlton also states that there are no material disputed issues of fact that stand in the way of summary judgment on the Commission issue and that there are only the parties' competing interpretations of the Agreement and Amendment, which can be decided as a matter of law. Carlton also cross-moves for summary judgment on all of Mirabella's affirmative defenses.

### A. The Aareal New Loan

To the extent that Carlton moves for summary judgment awarding it a Commission on the Aareal New Loan, that motion is denied. Under the unambiguous terms of the Agreement, Carlton is entitled to an Equity Commission under Section 3(C) as to the €6,878,947.08 of "new money" that Aareal loaned Mirabella secured by a subordinate mortgage on the Property. However, the amount of that Equity Commission is zero.

Mirabella owes Carlton an Equity Commission "[i]f at any time during the Term, [Mirabella] accepts a Commitment in writing from a Lender and/or an EJV Party for . . . subordinate financing . . . with respect to" the Property. (Agreement § 3(C)). The New Loan Agreement between Mirabella and Aareal is a "Commitment" as it is a "mortgage loan . . . financing arrangement[]." (Agreement at § 1(A)). The New Loan Agreement was executed in October 2015, which for purposes of this discussion is assumed to be during the Term of the Agreement. Aareal, as a "subordinate lender" of the new money loan, is within the Agreement's definition of an "EJV Party," which does not exclude "Existing Lenders." (Agreement § 1(A)). Consequently, the Aareal New Loan of an additional €6,878,947.08 satisfies the conditions required for the payment of an Equity Commission under Section 3(C) of the Agreement.

The amount of the Commission payable to Carlton, however, is zero. Under Section 3(C), Carlton is entitled to a commission of 2.0% "of the maximum amount of the Commitment for funds in excess of 60% of the total project capitalization for any one or more individual Property or Properties." (Agreement § 3(C)). According to Mirabella, the total project capitalization is a least €320,000,000, of which 60% is €192,000,000. According to Carlton, the total project capitalization is €200,878,947.08, of which 60% is €120,527,368.25. In either case, the new money loan of approximately €7,000,000 is far below the 60% threshold for a Commission to accrue.

### B. Aareal's Extension of Maturity Dates on the Aareal Existing Debt

To the extent that Carlton moves for summary judgment awarding it a Commission (but not a Restructuring Fee) on Aareal's extension of maturities on the Areal Existing Debt, that motion is denied. Conversely, Mirabella's motion for summary judgment denying Carlton a Commission on Aareal's extension of the debt is granted.

11

Under the unambiguous terms of the Agreement, Carlton could be entitled to a Restructuring Fee for Aareal's agreement to extend the maturity dates on the Existing Debt for five years to December 2019 because that extension is a "Restructuring" under the Agreement. Mirabella owes Carlton a Restructuring Fee "[i]f a DPO . . . does not occur, but instead, a restructuring and/or work-out of all or any portion of the Existing Debt with the Exi[s]ting Lender(s) occurs (as applicable, a 'Restructuring') . . . ." (Agreement § 3(F)). The Amendment confirms that a Restructuring includes "any refinancing, 'rollover'/extensions and/or other workout or loan modification" with an Existing Lender. (*Id.*, Amendment § 5).

Here, Aareal's extension of the maturity dates of the Aareal Existing Debt constitutes a refinancing, rollover and extension. Absent an express definition for any of these terms, each is understood according to its plain meaning. *Eckman v. Eckman*, 999 N.Y.S.2d 494, 495 (2d Dep't 2014). The word "extension" has its ordinary meaning, which includes "an increase in length of time; specifically [] an increase in time allowed under agreement or concession." *Extension*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/extension (last visited Jul. 11, 2018). "Refinancing" means "[a]n exchange of an old debt for a new debt, as by negotiating a different interest rate *or term* or by repaying the existing loan with money acquired from a new loan." *Refinancing*, Black's Law Dictionary (10th ed. 2014) (emphasis added). "Rollover" means "[t]he *extension* or renewal of a short-term loan; the refinancing of a maturing loan or note. . . ." *Rollover,* Black's Law Dictionary (emphasis added). *See also Federal Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 564 (2d Cir. 2011) ("[I]t is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract.") (alterations in the original).

Carlton's argument that the entirety of the Mirabella-Aareal Agreement is a "first mortgage financing secured by [the Property]" thereby triggering the payment of a Mortgage Commission is unavailing. First, as discussed above, the Aareal New Loan is subject to an Equity Commission, but the amount of that commission is zero. Second, Aareal's extension of its debt maturities is subject to a Restructuring Fee, not a Commission.

Carlton's argument for a Commission on the extended debt maturities is premised on the apparently undisputed fact that the Aareal Existing Debt was a first mortgage financing secured by the Property, and that those terms were unchanged when Mirabella and Aareal extended the maturity dates. If the Agreement consisted of only Section 1(A) (which appoints Carlton Mirabella's exclusive agent to refinance the Existing Debt) and Section 3(B) (which provides for a Mortgage Commission), Carlton's argument might be persuasive. However, the Agreement must be read as a whole, and read as a whole, there is no ambiguity that would reasonably permit Carlton's interpretation. "To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole." *Amrusi*, 65 N.Y.S.3d at 65. There is no ambiguity if the contract as a whole removes any ambiguity in a particular provision. *Law Debenture Tr. Co. of N.Y.*, 595 F.3d at 467 (applying New York law).

The structure of the Agreement, specifically Sections 1 and 3, distinguishes two functions -- Carlton's procuring "new money" versus arranging for the restructuring of the Existing Debt. Carlton is empowered to obtain new money -- a new loan to replace the Existing Debt, or raising additional capital -- in Section 1(A); and Carlton is separately empowered to restructure the Existing Debt with the Existing Lenders in Section 1(B). The compensation provided in Sections 3(B) (Mortgage Commission) and 3(C) (Equity Commission) mirrors and corresponds to the new money financing in Section 1(A). The compensation provided in Section 3(F) (DPO

13

Advisory Fee and Restructuring Fee) mirrors and corresponds to the restructuring of existing debt with the Existing Lenders contemplated in Section 1(B). The Agreement by its terms thus provides four different measures of compensation that depend on what debt relief Mirabella obtains.

While the provisions are not mutually exclusive because Mirabella could obtain multiple forms of debt relief,[2] only one form of compensation is payable for each part of the relief obtained. Here, to the extent that the Mirabella-Aareal Agreement provides for new money, i.e. additional capital in the form of a subordinate loan, a Mortgage Commission was potentially payable as discussed above. To the extent the Mirabella-Aareal Agreement provides for the restructuring of Existing Debt, a Restructuring Fee was potentially payable.

Carlton argues that, even if the extension of maturities entitles it to only one type of compensation specified in the Agreement, that extension was not a Restructuring subject to a Restructuring Fee, so it must be a "financing" subject to a Commission. Carlton is mistaken that a Restructuring must involve an Existing Lender discounting or forgiving some amount of the outstanding loan, which did not happen here. Section 3(F) of the Agreement provides separately for a DPO Advisory Fee and a Restructuring Fee. A Restructuring Fee is payable "[i]f a DPO of all or any portion of the Existing Debt does not occur" -- in other words, if a discount does not occur, but instead some other kind of "restructuring and/or workout" with an Existing Lender occurs. (Agreement § 3(F)).

---

[2] For example, Carlton could negotiate a DPO reducing the principal amount of the Existing Debt (resulting in a DPO Advisory Fee under Section 3(F) of the Agreement), and Mirabella could obtain financing from a new lender to replace some or all of the Existing Debt (resulting in a Mortgage Commission under Section 3(B) of the Agreement).

14

This construction does not yield an absurd or commercially unreasonable outcome, as Carlton argues. The exclusive agency relationship under the Agreement benefited Carlton by ensuring that Mirabella was precluded from retaining Carlton's competitors to negotiate with third-party financial institutions or Existing Lenders to obtain financing for Mirabella, and by guaranteeing Carlton a retainer for its efforts, and potentially rewarding Carlton with additional compensation depending on the amount and nature of the debt relief that Mirabella ultimately achieved. In that way, therefore, even absent the payment of a Commission, the Agreement gave substance to the exclusive agency relationship between Mirabella and Carlton.

Because Carlton has abandoned its claim for a Restructuring Fee, the myriad issues that would have to be decided to determine if any amount were due to Carlton as a Restructuring Fee need not be addressed.[3] With regard to Aareal's extension of maturities, Mirabella's motion for summary judgment as to the payment of a Commission and a Restructuring Fee is granted.

**C.     Affirmative Defenses**

The Affirmative Defenses potentially apply only to Carlton's remaining claim for outstanding Retainer Fees, which was not the subject of these cross-motions. Carlton did not argue for payment of its Retainer Fees as part of its motion seeking payment of a Commission because the Agreement provides that Retainer Fees are credited against any Commission. Carlton also did not expressly disclaim any entitlement to the Retainer Fees, as it did the Restructuring Fee. Accordingly, the claim for unpaid Retainer Fees remains.

---

[3] These issues include the calculation of any Restructuring Fee under the Agreement; the applicability of the minimum Restructuring Fee under the Amendment based on whether the Gatehouse Term Sheet was a bona fide Commitment; whether Carlton breached a fiduciary or contractual duty to Mirabella by withholding the Gatehouse Term Sheet until Mirabella signed the Amendment; whether Mirabella was coerced or forced to enter into the Amendment; if so, whether Mirabella subsequently ratified or acquiesced to the Amendment; and whether the Amendment is enforceable.

The Agreement provides for the payment of Retainer Fees for the term of the Agreement. Under the Agreement, its term ended some time in 2014. The Amendment extended the term of the Agreement until the end of 2015. Mirabella paid monthly Retainer Fees through July 2015. Thus Mirabella's claim is at most for five months of Retainer Fees for the remainder of 2015, totaling €75,000.

Except for the two affirmative defenses based on breach of fiduciary duty and the faithless servant doctrine, Mirabella did not oppose, and did not adduce any evidence to support, its affirmative defenses. Consequently, Carlton's motion for summary judgment is granted as to these affirmative defenses. *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("if a non-moving party fails to oppose a summary judgment motion, then summary judgment, *if appropriate*, shall be entered against' him.") (internal quotation marks and citation omitted) (emphasis in the original); *accord Johnson v. DCM Erectors, Inc.*, No. 15 Civ. 5415, 2017 WL 1435745, at *1–2 (S.D.N.Y. Apr. 21, 2017).

The breach of fiduciary duty defense is also dismissed. First, breach of fiduciary duty does not appear to be an affirmative defense to enforcement of a contract, but rather a counterclaim. *See Reyes v. Gracefully, Inc.*, No. 17 Civ. 9328, 2018 WL 2209486, at *3 (S.D.N.Y. May 11, 2018) ("Under New York law, a party who signs a contract is bound by its provisions unless he can show 'special circumstances,' such as fraud, duress, coercion, or misrepresentation, that 'relieve him of such an obligation.'") (citation omitted; applying New York law); *Premier Ford N.Y., Inc. v. Ryan*, No. 16 Civ. 9009, 2018 WL 2709574, at *2 (2d Dep't Jun. 6, 2018) (same); *see, e.g., Supreme Showroom, Inc. v. Branded Apparel Grp., L.L.C.*, No. 16 Civ. 5211, 2018 WL 3148357, at *8 (S.D.N.Y. Jun. 27, 2018) (faithless servant and breach of fiduciary duty were pleaded as counterclaims under New York law). Mirabella,

16

however, did not plead breach of fiduciary duty argument as a counterclaim, and instead pleaded it only as an affirmative defense.

Second, even if breach of fiduciary duty were a proper defense to enforcement of a contract, Mirabella is estopped from claiming that the Amendment (and its provision extending the term of the Agreement) should not be enforced. Both parties relied extensively on the Amendment in their briefing and accepted its validity. Mirabella paid at least seven months of Retainer Fees pursuant to the Amendment. The Amendment is in part the basis for the Court's holding above that the Aareal extension of maturities was a "Restructuring," that could entitle Carlton to a Restructuring Fee but not a Commission. Therefore, the parties are estopped from asserting that the Amendment is unenforceable. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."); *accord BPP Ill. v. Royal Bank of Scot. Grp. P.L.C.*, 859 F.3d 188, 192 (2d Cir. 2017).

Mirabella's only remaining affirmative defense is based on the faithless servant doctrine, which bars any payment from the time of the disloyalty. "[O]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his or her services is generally disentitled to recover his or her compensation, whether commissions or salary." *City of Binghamton v. Whalen*, 32 N.Y.S.3d 727, 728 (3d Dep't 2016). "New York law with respect to disloyal or faithless performance of employment duties is grounded in the law of agency, and has developed for well over a century." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003). "[M]isconduct by an employee that rises to the level of a breach of a duty of loyalty

17

or good faith is sufficient to warrant forfeiture." *Id.* at 202 (citing *Lamdin v. Broadway Surface Advert. Corp.,* 5 N.E.2d 66, 67 (1936)).

Here, Carlton owed a duty of fidelity to Mirabella with regard to the Gatehouse Term Sheet. An exclusive agency relationship gives rise to a fiduciary duty between principal and agent under New York law. *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 453 (S.D.N.Y. 2015) (citing *Vill. on Canon, Bankers Tr. Co.*, 920 F. Supp. 520, 532 (S.D.N.Y. 1996) (citing New York law)); *see also Cornwell v. NRT N. Y., L.L.C.*, 944 N.Y.S.2d 132, 133 (1st Dep't 2012) (finding a fiduciary relationship between the plaintiff and the defendant real estate brokerage where there is an exclusive agency relationship). Carlton's withholding the Term Sheet until Mirabella agreed to sign the Amendment, which included compensation terms favorable to Carlton, may be a breach of that duty.

Carlton asserts that Mirabella was aware of the general structure of the Gatehouse Term Sheet even before signing the Amendment, and that Mirabella knowingly and freely accepted Carlton's offer to disclose the full terms of the Gatehouse Term Sheet after the Amendment was signed. There is also the question of whether Mirabella ratified Carlton's allegedly wrongful act, for example, by accepting the Amendment and paying Retainer Fees under its extended term until July 2015, or by relying on the Amendment in this lawsuit. "[U]nder New York law a contract entered into under duress is generally considered not void, but merely voidable, . . . and one who would repudiate a contract procured by duress *must act promptly or will be deemed to have elected to affirm it.*" *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 89 (2d Cir. 2011) (emphasis in original); *accord Lynch v. Oliver*, No. 15 Civ. 4971, 2016 WL 344980, at *3 n. 1 (S.D.N.Y. Jan. 27, 2016) ("[U]nder new York law, an unconscionable agreement is voidable, not void . . . . Because he failed to promptly repudiate [it,] . . . Defendant

cannot now avoid its terms."), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith Inc. v. Oliver*, 681 F. App'x 64 (2d Cir. 2017).

Because disputed issues of fact must be resolved to adjudicate the faithless servant affirmative defense, Carlton's cross-motion for summary judgment as to that defense is denied, but is granted as to all the other affirmative defenses.

### D. Attorneys' Fees

Although Mirabella's motion is granted, that did not dispose of the case in its entirety. Consequently, the "prevailing party" under the Agreement cannot be determined at this juncture. Therefore, the issue of attorneys' fees is not addressed.

## IV. CONCLUSION

For the foregoing reasons, Mirabella's motion for summary judgment is GRANTED as to Carlton's entitlement to a Commission or Restructuring Fee. Carlton's cross-motion for summary judgment is DENIED, except GRANTED striking all affirmative defenses except the Ninth Affirmative Defenses (faithless servant doctrine). Carlton's claim for its Retainer Fees remains.

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 72, 74, 84 and 86.

Dated: July 19, 2018
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE